**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-292-02** |
| **DANIEL LYONS SCOTT,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Daniel Lyons Scott, to 60 months' imprisonment, three years of supervised release, $2,000 in restitution, and $200 in mandatory special assessments. The government's recommendation is near the high end of the applicable guidelines range, as calculated by the government, of 51 to 63 months.

**I.      INTRODUCTION**

Scott was one of the key actors in the January 6, 2021 attack on the United States Capitol. It was Scott who openly encouraged his fellow Proud Boys members to "take the fucking Capitol" while they gathered on the Capitol's east plaza at 11:45 a.m. that day, over an hour before the first breach of the Capitol grounds.   As this Court knows, many of those same Proud Boys would later assault officers and enter the U.S. Capitol Building.   Scott then entered Capitol grounds in the first wave of rioters, rushing ahead in a stack formation with other rioters from his Proud Boys chapter, including his co-defendant Christopher Worrell.

1

Over the next hour, the U.S. Capitol Police barely held back the riotous crowd on the west plaza, withstanding repeated violent clashes with protestors.   Others from Scott's Proud Boys chapter, or "zone," pepper sprayed the police and joined groups attempting to push through the police line.   But the line held.   By around 1:45 p.m., the police line seemed to momentarily stabilize; officers were slowly pushing rioters back, and reinforcements had arrived in the form of Metropolitan Police Department officers.   Then Scott acted.   He squared up against the weak point in the line: a thinly defended staircase on the north end of the west plaza that had, to that point, largely escaped rioters' focus.   Using his massive size and strength—Scott is 6'5" and 322 pounds, PSR ¶ 118—Scott bulldozed *two* U.S. Capitol Police officers backward and up a set of steps.   The hole created by Scott's advance collapsed that part of the line.   The rioters behind Scott, including two of his zone-mates and numerous other Proud Boys, rushed up the stairs and were the first to enter the building about 20 minutes later through the Senate Wing Door. Congress was then still in session.   The Senate Wing Door would become one of the two most significant breach points at the Capitol that day.   The mob Scott set loose also outflanked the remaining officers on the West Plaza, and the police ultimately lost the line they had fought to maintain.

Scott, for his part, celebrated with his zone-mates within mere seconds of his assault.   He and they recognized immediately the gravity of what had just occurred.   And they congratulated Scott for having accomplished what they set out to do that afternoon: breach the police line to unleash the crowd of rioters toward, and ultimately inside, the building.   With Scott's assault, his call to "take the fucking Capitol" turned from a rallying cry into a reality.

Scott played as pivotal a role as any other rioter in the ultimate breach of the U.S. Capitol

2

Building—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]   He acted in coordination with a group of others from his Proud Boys zone who had repeatedly tested the police line before his assaults.   And he was one of the first amongst the more than 100 Proud Boys present at the Capitol to openly call for the U.S. Capitol building to fall. His conduct warrants a sentence that matches his outsized role.

The government recommends that the Court sentence Scott to a total of 60 months' incarceration on his obstruction conviction under 18 U.S.C. § 1512(c)(2) and his assault conviction under 18 U.S.C. § 111(a)(1).   That sentence appropriately reflects the fact that Scott is one of the few rioters whose conduct can be fairly characterized as potentially a but-for cause of the actual breach of the U.S. Capitol building.   It also reflects the fact that Scott, unlike some rioters, apparently intended to, or had at least considered, breaching the Capitol even prior to former President Trump's speech, and long before entering Capitol grounds, and that he acted in concert with others that day.

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

████████████████████████████████████ Scott minimized his own, and his comments betrayed a lack of remorse about what occurred on January 6, 2021 and the role he played.  That is a further reason why the Court should impose a sentence near the top of the Guidelines. ███████████████████████ the government would recommend a sentence at the top of the guidelines, or even an upward variance, given how dangerous and significant Scott's role was.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, Dkt. 209, for a short summary of the January 6, 2021 attack on the United States Capitol.

### B.     Scott's Role in the January 6, 2021 Attack on the Capitol

#### *Statements and conduct leading up to January 6, 2021*

Scott and his co-defendant Christopher Worrell are members of the Proud Boys organization and were members of that organization's "Hurricane Coast" (or "Zone 5") chapter, which covered portions of southwest Florida.  Many Proud Boys knew Scott by the nickname "Milkshake."

Leading up to January 6, 2021, Scott discussed with other Proud Boys members, on the encrypted messaging application Telegram, what would occur on January 6, 2021 and the potential for violence that they anticipated that day.   For example:

- On November 30, 2020, Scott stated:

  o ". . . I'll see you f****** in DC. I'm going for the smashing of wypipo who call themselves Jewish which control the left commie idea and push it for the destruction of our great nation… they get the smoke first... hopefully that isn't racist

4

or antisemitic for you new people... but if you have been in this game for awhile thats who you are really fighting."

- On December 16, 2020, Scott stated, in response to another user posting a video from a

  Proud Boys rally in Washington D.C. on December 12, 2020 that had turned violent:

  o "That's the only thing I saw that I was mad about. You guys don't know how to knock people out with one hit."

- On December 19, 2020, a Telegram user stated in a chat with Scott and others:

  o "Trump is asking all his supporters to show up January 6th in DC to fight for him. We all going or what? Our stand down and stand by order is officially canceled".

  o Another user replied: "If he's gonna install himself as a Fascist dictator, sure.   But if it's just gonna be a g** MAGA protest which accomplishes nothing, count me out."

  o The first user stated: "January 6th is when congressmen can object to the electors. The last chance to stop the steal.  If millions of Trump supporters show up, congress might do the right thing. Maybe . . ."

  o Scott later posted: "[Another user] doesn't realize we will soon be the Sturmabteilung."[2]

- On December 30, 2020, Scott stated:

  o "No one will do anything. The right-side is to worried about their last grasping days of so called freedom. Slowly to be choked out by the suppression of our new nation that lacks self preservation an accountability. We have become obedient to this sickening silence. Everyday we lose more and more. When is enough a enough? When do you guys want to kick it off? The famous words said so often today. I will strike in the dark of night. Unseen justice is all we have to live by now. Time to regain control of our great nation."

- On January 4, 2021, a Telegram user stated in a chat with Scott, Worrell, and others:

  o "You know, if congress is blocked from the joint session on the 6th, they don't certify and trump stays.   Would be shame if protest kept them from doing that."

---

[2] The Sturmabteilung were the first paramilitary force of the Nazi Party and were colloquially called "Brownshirts."

On January 3, 2021, Scott, Worrell, and other members of their local Proud Boys chapter attended a "Stop the Steal" rally in Naples, Florida.   The headline speaker at this event was Roger Stone.   Scott helped Stone up a ladder that Stone used to talk to the crowd.   During this speech, Stone asserted that the 2020 presidential election was rigged due to voting fraud and urged Florida's U.S. Senators to vote against the certification of the Electoral College vote.   Stone stated: "Rick Scott has a fundamental choice.   He will either stand up for the Constitution . . ." At that point, Scott yelled "Or give him the rope!"   *See* Worrell Tr. Ex. 250.[3]   On Telegram, his Proud Boys brothers later praised Scott for the violent retort.   At another point in the rally, Scott chanted "Stop the Steal!" into a megaphone, along with the crowd.

### *The morning of January 6, 2021*

On January 5, 2021, Scott traveled to D.C. as part of a larger group of his Proud Boy zone-mates from Southwest Florida.   On the morning of January 6, Scott walked with these zone-mates to the Washington Monument, where he met more than 100 Proud Boys members from across the country, including Ethan Nordean (one of the leaders of the Proud Boys on the ground that day), with whom he spoke.   Scott was already wearing a bulletproof vest under his jacket, and brought ski goggles with him, as depicted in Image 1 below:

---

[3] Exhibits from the trial of Scott's co-defendant, Christopher Worrell, will be referred to by their trial exhibit number (as "Worrell Tr. Ex."), and will be provided to the Court again prior to sentencing.



*Image 1* (Worrell Tr. Ex. 134A)

The five numbered individuals in Image 1 all entered Capitol grounds with Scott and Worrell.   They are two individuals from southwest Florida (#1 and #2), and the Proud Boys with aliases "J-Bird" (#3), "El Greco" (#4), and "Leo Riddler" (#5).   At the Washington Monument, Ethan Nordean gave a series of orders to the Proud Boys through a megaphone, including "slow and steady pace to the Capitol" and "develop that front line, get a move on."   Worrell Tr. Ex. 565 at 3:42-4:45.   Shortly after 10 a.m., Scott and the larger group of over 100 Proud Boys marched to and around the Capitol building.

Around 11:45 a.m., while the group was rallying on the east side of the U.S. Capitol building, and before President Trump had even begun to speak at the rally at the Ellipse, Scott yelled "Let's take the fucking Capitol!"   That exhortation is captured in Worrell Trial Exhibit 250.

7

Another Proud Boy stated to Scott: "Let's not fucking yell that, alright?"   Shortly thereafter, another Proud Boy said: "Don't yell it, do it."

As the Proud Boys and Scott marched around the Capitol, Scott's fellow Proud Boys taunted and threatened Capitol Police.   For example, Worrell shouted at officers donning riot gear: "Honor your oaths! . . . Don't make us go against you!"   Worrell Tr. Ex. 110A.

### Scott's conduct on U.S. Capitol Grounds

After stopping for lunch at a group of food trucks, the group of Proud Boys marched in an organized column formation to the Peace Circle entrance to Capitol Grounds at around 12:45 p.m. Soon after the Proud Boys arrived, the first breach of the restricted perimeter occurred, as rioters overran and assaulted police and toppled bike racks and snow fencing protecting the area.   Many of the Proud Boys joined the mob surging forward.   At approximately 12:57 p.m., within minutes of the police line at that entrance being breached, Scott, Worrell, "J-Bird," "El Greco," "Leo Riddler," and several other men who had joined their group moved together in a coordinated stack formation onto Capitol grounds.   They marched past the downed barricades and trampled fencing. Worrell filmed the group, in Worrell Trial Exhibit 211, having the following conversation:

- **Scott: "Oh god, we're going to the Capitol, guys."**
- Zone-mate "El Greco": "Kicking the doors in."
- Worrell: "Trump is coming to the Capitol."
- Another Proud Boy: "Taking that motherfucking Capitol back."
- **Scott: "I've never been in the Capitol before."**
- Zone-mate "El Greco": "Zone 5, stay tight!"
- **Scott: "Hey Zone 5, stay tight!   Nobody gets around us."**

Worrell, Scott, and the three other Proud Boys from their zone moved to the front of the crowd facing a line of law enforcement officers on the lower west plaza.   For the next 45 minutes, the police struggled to contain the crowd, while Scott's zone-mates poked and prodding, assaulting

officers or attempting to breach the police line.   At 1:30 p.m., "Leo Riddler" joined a group

pushing into the police line.   A minute later, Worrell sprayed the same area of the police line with

pepper gel, then rushed back to report to Scott that he had "just deployed a whole can."   *See*

Worrell Tr. Ex. 247A.



*Image 2* (Worrell Tr. Ex. 254 at 0:49)          *Image 3* (Worrell Tr. Ex. 230)

The group then moved a few yards north, in front of a smaller group of USCP officers

guarding the northwest stairs of the West Terrace of the Capitol.   This area is depicted in Image

4 below, in which "Leo Riddler," "El Greco," "J-Bird," Worrell, and Scott are circled; Scott is in

the bottom center circle in a blue cap and ski goggles.



*Image 4*

Scott took up position directly in front of the officers.   Over the next 10-15 minutes, all five of the individuals (pictured in Worrell Trial Exhibit 134A above) in Scott's group took up positions behind Scott.   Numerous other Proud Boys also moved toward these stairs and stood in the crowd behind Scott.

At about 1:48 p.m., Scott was facing two USCP officers, Nathan Cole and Cameron Cetrone.   Scott suddenly moved forward, apparently single-handedly pushing the two officers backward and up the stairs.   This is shown in Worrell Trial Exhibits 248 and 173, both videos:



*Image 5* (Worrell Tr. Ex. 248 at 0:20-32 and Worrell Tr. Ex. 173 at 0:00-05)

Almost immediately after Scott's violent charge, another Proud Boy member ("El Greco") and a prospective Proud Boy member (Barry Ramey)—both of whom were seen with Scott that day— deployed pepper spray or pepper gel at the police.

Scott then grabbed Officer Cetrone and pulled the officer's torso and head down, into the crowd, before letting go, as depicted in Worrell Trial Exhibit 249.   During the time that Officer Cetrone was held by Scott, Cetrone was punched in the shoulder.



*Image 6* (Worrell Tr. Ex. 249)

Worrell would later state on a jail call that he had seen Scott "bodyslam" an officer during this assault.   Worrell Tr. Ex. 315.   Officer Cole testified in the trial of Christopher Worrell that he grabbed Officer Cetrone and pulled Cetrone out of the crowd out of fear that the crowd would harm Cetrone.   Officers Cetrone and Cole retreated up the stairs a few seconds later, with other USCP officers.

Hundreds of members of the crowd behind Scott, including numerous Proud Boys, surged up the stairs after Scott's assaults.   Within approximately 20 minutes, at 2:13 p.m., the group of

rioters unleashed by Scott's assaults became the first group of rioters to enter the U.S. Capitol building through the Senate Wing Door, when Congress was still in session.

Scott moved to the left of the crowd and celebrated with his zone-mates, as shown in these screenshots from Worrell Trial Exhibit 173 (featuring Scott and individual #2 from Exhibit 134A):



*Images 7-8* (Worrell Tr. Ex. 173 at 0:15)

In a video Worrell filmed shortly thereafter, Scott yelled: "Proud of your fucking boy!" to his zone-mates, most of whom then displayed a Proud Boys "OK" hand symbol to each other.   "J-Bird" said: "We did it, man."   And Worrell then said: "Yeah! Taking the Capitol!"   Scott had donned a red, white, and blue-striped cowboy hat for the celebration:



*Image 9* (Worrell Tr. Ex. 112A at 0:28)

After breaching the police line, Scott and several in his zone made their way north, ultimately exiting Capitol grounds.  On Telegram, someone posted: "Today we started a war against our traitors.  Time to step up and fight or cuck.  What choice will you make?"  Scott replied: "Yup!"

After traveling home, on January 7, 2021, Worrell texted Scott about a dispute they were having with the leadership of their local Proud Boy chapter.  Scott texted Worrell: "Siege the chapter."   Worrell replied: "Much easier than the Capitol."

In the days following January 6, Scott made the following "challenge coin" to celebrate the Proud Boys' breach of the building, featuring a noose, guillotine, and flames:

14



*Image 10* (Worrell Tr. Ex. 564)

***Scott's Interviews***

After being charged by complaint in April 2021 and subsequently indicted, Scott voluntarily sat for an interview with law enforcement on November 17, 2021. ▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬   With respect to his own conduct, Scott claimed that in the video of his assault, he was being pushed from behind, that he did not know if he had been merely pushed into the officers, and that he had only "touched" two officers before moving back down the steps.   When asked directly what he had done, Scott tried to claim that the whole event was a "blur" and that he did not recall what had happened.   The government terminated the interview.

Scott participated in a second interview in November 2022. ▬▬▬▬▬▬▬▬▬▬

15

████████████████████████████████████████████

████████████████████████████████████     But, once more, Scott minimized his

own conduct. Scott again conceded that he had touched the victim officers, but again cast some

blame on the crowd for pushing from behind.   He blamed the police for not warning the crowd to

disperse.   At one point he indicated that he understood he was guilty of assault because even a fly

landing on an officer would be guilty of assault.   He further stated that he had moved forward not

to breach the police lines, but to get away from where officers were deploying concussion grenades

and pepper balls.   Scott also claimed he did not even intend to go to the Capitol on the morning

of January 6, 2021, and had just happened to run into other Proud Boys near the Washington

Monument and followed them there.   He claimed that the Proud Boys did not know where they

were going when they started walking to the Capitol.   Finally, Scott claimed that he "didn't realize

there was even a process to certify the election on that day."

## III.   THE CHARGES AND PLEA AGREEMENT

On June 1, 2022, between Scott's two interviews, a federal grand jury returned a second

superseding indictment charging Scott and Worrell.   Scott was charged with nine counts,

including:

- Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One);
- Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Three);
- Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Five);
- Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Seven);
- Act of Physical Violence in the Capitol Grounds or Building, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Nine);
- Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Counts Eleven and Twelve);

16

and
- Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Counts Fourteen and Fifteen) (with one count for each officer Scott assaulted).

On February 9, 2023, Scott pled guilty to Counts One (obstruction of the official proceeding) and Fifteen (assaulting a federal officer, specifically Officer Cetrone).

## IV.    STATUTORY PENALTIES

As noted by the plea agreement and the Presentence Report ("PSR") issued by the U.S. Probation Office, Count One carries a maximum sentence of 20 years' imprisonment, a fine of up to $250,000, and a term of supervised release of not more than three years, while Count Fifteen carries a maximum sentence of eight years' imprisonment, a fine of up to $250,000, and a term of supervised release of not more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

**Count One.**   The final PSR calculates the offense level for Count One as follows:

Count One: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Injury/threatened injury to obstruct | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial interference | +3 |
| U.S.S.G. § 2J1.2(b)(3) | Extensive in scope, planning, or preparation | +2 |
| U.S.S.G. § 3A1.2(a) | Official victim | +3 |
| | **Total:** | **30** |

*See* PSR ¶¶ 80-87.

The PSR's Count One offense level calculation is correct, with one exception. The government disagrees with the PSR's inclusion, under Count One, of a three-level official victim enhancement under U.S.S.G. § 3A1.2(a). *See* PSR ¶ 84. As noted below, Count Fifteen, which reflects the assault on Officer Cetrone, includes a six-level victim enhancement under U.S.S.G. § 3A1.2(b). Unlike the assault reflected in Count Fifteen, however, the crime charged in Count One, obstruction of Congress, has no individual victim. The victim of the obstruction of official proceeding count is Congress, despite the fact that an individual officer was assaulted during the course of the obstruction offense. Since U.S.S.G. § 3A1.2(a) specifically requires that "the victim" of the offense be a government officer or employee, the § 3A1.2(a) adjustment is not applicable to Count One here. *Compare* U.S.S.G. § 3A1.2(a) (requiring application of the adjustment "[i]f . . . the victim was . . . a government officer or employee") *with* U.S.S.G. § 3A1.2(c) (requiring application of the adjustment if "the defendant, [*inter alia*,] . . . assaulted such officer during the course of the offense or immediate flight therefrom," without requiring that the officer be the victim of the offense of conviction). Therefore, the government submits that the correct guidelines calculation for Count One is as follows:

<u>Count One: 18 U.S.C. § 1512(c)(2):</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Injury/threatened injury to obstruct | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial interference | +3 |
| U.S.S.G. § 2J1.2(b)(3) | Extensive in scope, planning, or preparation | +2 |

**Total:**                                                                      **27**

Scott agreed to the guidelines calculations above with the exception of the two-level enhancement to the offense level pursuant to U.S.S.G. § 2J1.2(b)(3) due to the offense being extensive in scope, planning, or preparation.  *See* Plea Agreement (Dkt. 208), ¶4A.  The plea agreement noted that the government would seek this enhancement, and the government agrees with the U.S. Probation Office that it applies here.  *Id.*; *see also* PSR ¶ 83.

Section § 2J1.2(b)(3)(C) provides a two-level enhancement if the offense was "otherwise extensive in scope, planning, or preparation."   While Scott's conduct was extensive in all three ways, the Court need only find that Scott's conduct was extensive in either scope, planning, or preparation.  *See United States v. Petruk*, 836 F.3d 974, 977 (8th Cir. 2016).   While "otherwise extensive" is not defined in the Guidelines, "there are a number of factors relevant to the extensiveness determination, including the length and scope of the criminal activity as well as the number of persons involved." *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994).  Thus, in *United States v. Pegg*, 812 F. App'x 851 (11th Cir. 2020) (per curiam) (unpublished), the Eleventh Circuit affirmed the application of the two-level enhancement under § 2J1.1(b)(3)(C), holding that the record supported the district court's finding that the defendant's conspiracy to obstruct justice was "extensive in scope and planning" where the defendant directed several people through coded phone calls and emails and was part of a "scheme [that] involved an elaborate

gathering together of lies and misrepresentations." *Id.* at 860.  Similarly, in *Petruk*, 836 F.3d at 977, the Eighth Circuit affirmed that the obstruction of a defendant who, while incarcerated, solicited his girlfriend to find someone else to falsely claim on a recorded line to be the perpetrator of the underlying crime was extensive in planning and preparation (though not in scope) under § 2J1.2(b)(3)(C).  *See also United States v. Bakhtiari*, 714 F.3d 1057, 1062 (8th Cir. 2013) (applying enhancement to defendant who obtained photographs of victim's house and family, created a fake email account, and disguised email as sent from hotel).

In addition, Judge Friedrich has twice applied the enhancement to defendants convicted of crimes related to the attack on the Capitol. In *Reffitt*, over the defendant's objection, Judge Friedrich found that the enhancement applied both because of the defendant's extensive efforts in "planning and preparation" and the extensive "scope" of what the defendant intended to accomplish. No. 21-cr-32, Sent. Tr. at 46-47. She found that there was "enough evidence of planning and preparation here in terms of organizing the trip, in terms of gathering together this wide range of sophisticated gear, not just firearms, but a helmet, bulletproof vest, flex cuffs, radios, and megaphones. There was a lot of thought and planning that went into this offense." *Id.* And the defendant's "stated intentions" were "hugely extensive in scope": forcibly removing and then replacing legislators. *Id.* at 46. In *Sandlin*, the defendant agreed to the application of the enhancement in his plea agreement, and Judge Friedrich applied it during his sentencing. No. 21-cr-88 (Dec. 9, 2022), Sent. Tr. at 36. According to the agreed-upon statement of offense, Sandlin traveled to D.C. with two co-conspirators and multiple weapons, including two firearms. No. 21-cr-88, Dkt. 85 at ¶ 15.

Here, Scott's offenses were extensive in planning, preparation, and scope.  Scott's

preparation and planning for January 6 were more extensive than Petruk's phone calls to his girlfriend from jail.   First, Scott was involved in numerous discussions over encrypted media with other Proud Boys leading up to January 6, 2021, regarding the need to protest the election results, what could disrupt the certification on January 6, 2021, and how to organize that group to prepare for, or inflict, potential street violence.   *See supra* at 4–6.   Second, Scott prominently participated in the January 3, 2021 "Stop the Steal" rally featuring Roger Stone, helping Stone up a ladder to speak; leading the crowd in chants of "stop the steal!", and asserting that the crowd should "give [U.S. Senators] the rope" if the senators voted to certify the 2020 election.   Dkt. 209 at 4–5.   This further indicates that Scott's intent to use violence if necessary to disrupt the certification was conceived in advance of January 6, 2021.   Third, Scott traveled from Florida to D.C., and arrived at the National Mall on January 6, 2021 wearing a tactical ballistic vest and ski goggles, plainly anticipating potential violence and crowd-control munitions.   (Indeed, in Exhibit 1, Scott has a conversation in which he discusses the goggles' ability to protect his eyes from pepper spray, confirming that was the reason he left the hotel with them on January 6.)   The group he traveled with brought internal communications equipment, including Worrell's and others' Baofeng radios, to communicate with one another.   Proud Boys leaders had communicated what to wear and bring on January 6, 2021: not to wear Proud Boys colors (yellow and black); to wear tactical gear; to bring communication equipment; and to arrive for the gathering of the Proud Boys at the Washington Monument on the morning of January 6, 2021.[4]   Scott appears to have followed those

---

[4] *See, e.g.*, Worrell Tr. Ex. 175 at 11 (Proud Boy stating: "Everyone needs to meet at the Washington Monument at 10am tomorrow morning!! Do not be late! Do not wear colors! . . ."); *id.* at 13 (Proud Boy referring to Worrell's Baofeng radio frequency and stating "Everyone get on this channel until further notice").

planning instructions to a tee.

Scott's offenses were also extensive in scope.   As in *Pegg*, Scott's scheme also involved numerous people.[5]  Scott traveled to and around Washington, D.C. on January 5-6, 2021 as part of a larger group that included multiple Proud Boys members from his zone.   On the morning of January 6, Scott walked with these zone-mates to the Washington Monument, where he met more than 100 Proud Boys members from across the country, including Proud Boys leaders.   Scott's group marched to the Capitol on January 6 at around 10 a.m., well in advance of the crowd at the Washington Monument.   At around 11:45 a.m., on the east side of the U.S. Capitol building, Scott yelled "Let's take the fucking Capitol!" to his fellow Proud Boy brothers.   And when entering Capitol grounds with his Proud Boy zone-mates, Scott made statements indicating his intent to go inside the building.  *See supra* at 8.   Additionally, Scott flashing the Proud Boys hand gesture to his crew of Florida Proud Boys members immediately after his assault of Officers Cole and Cetrone confirms that Scott's violence was in service of the group's purpose that day.

Scott's secret, encrypted communications with group members prior to January 6, 2021, his travel from Florida to D.C. with gear designed to confront officers, early move toward the U.S. Capitol, statements about breaching the building, and concerted conduct with other Proud Boys from his zone together confirm that Scott's obstruction offense—culminating in his breach of the police line that unleashed a mob toward the Capitol—was extensive in planning, preparation, and scope.

---

[5] Although the court in *Pegg* did not specify the number of people involved in the defendant's scheme, in finding that the defendant's scheme was extensive in scope, the court noted that Pegg had "direct[ed] *several* people through numerous coded phone calls and e-mails."  *Pegg*, 812 F. App'x at 860 (emphasis added).   These individuals were Pegg's "friends and family."  *Id.* at 855.

**Count Fifteen.**   The final PSR does not include a Guidelines analysis for Count Fifteen because that count groups with Count One. *See* PSR ¶ 79.   However, the Court should, at sentencing, still calculate the offense level for Count Fifteen so that the calculated offense levels for both counts are clear.   *See* U.S.S.G. §1B1.1(a)(4).   The offense level calculation to which the parties agreed in the plea agreement is set forth below:

Count Fifteen: 18 U.S.C. § 111(a)(1):

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
|  | **Total** | **20** |

**Grouping Analysis.**   As the final PSR notes and the parties agree, Count One and Count Fifteen group for purposes of the guidelines because "because Count 15 embodies conduct that is treated as a specific offense characteristic in . . . the guideline applicable to Count 1."   PSR ¶ 79 (citing U.S.S.G. §3D1.2(c)).   Specifically, the assault is the basis for the +8 enhancement (for causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice) to the Count One offense level, an enhancement that the parties and PSR agree applies.   Therefore, Counts One and Fifteen group.   The parties and final PSR also agree that Count One has the higher offense level, and so that offense level controls the total offense level.

**Total Offense Level.**   Because Counts One and Fifteen group, the adjusted offense level for the grouped counts is the higher of the two offense levels: 27.   PSR ¶ 79.   With a three-level

---

[6] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

reduction for acceptance of responsibility under U.S.S.G. §3E1.1, the total offense level should be 24.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 94. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 24, Scott's guidelines range is 51 to 63 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Scott's conduct on January 6, 2021 sets him apart from most other rioters because of the vital role he played in breaching the otherwise intact police line on the west front that afternoon.   When he used his imposing physical presence to bulldoze the officers blocking the staircase, he both cleared a path for the mob and inspired the crowd behind him to join in the attack and surge forward.   But for Scott's actions, it is not even clear that rioters would have breached the west front police line that day, much less ascended the stairs to enter the building through the Senate Wing Door.   That door was the first breach point in the Capitol building, through which hundreds of rioters—including many of the most aggressive, like those who chased Officer Goodman, breached the Senate Gallery, overran officers in the Crypt, and invaded Speaker Pelosi's office—entered.   The dramatic consequences of Scott's assaults on Officers Cole and Cetrone—and his admitted, contemporaneous intent to obstruct the certification via that assault—thus distinguish Scott from most other defendants convicted of assault, few of whom can claim to have initiated the collapse of the police line.

Moreover, Scott's assaults were not an isolated, aberrational incident.   Scott entered Capitol grounds with a band of his Proud Boy brothers, several of whom then attempted to breach the police line.   Scott was merely the most successful of his group at unleashing the pent-up crowd's rage.   After his assaults, Scott and his zone-mates confirmed that breaching the police line to get rioters into the building was the plan all along.   Scott and Individual #2 from Worrell Trial Exhibit 134A immediately clasped hands to celebrate Scott's breach.   "J-Bird" then stated: "We did it, man."   And Scott and Worrell then loudly reveled in the fact that Scott's breach would permit the crowd to "tak[e] the Capitol."

Scott's conduct is further aggravated because of his association and coordination with other Proud Boys leading up to and on January 6.   As Judge McFadden recently found, "the violence, the planning, and the extremist intentions of the group" make a defendant's association with the Proud Boys on January 6 an aggravating factor.   *United States v. Speed,* 22-cr-244 (TNM), May 8, 2023 Sent. Tr. at 37.   As seen in the Telegram chats in which Scott participated, leading up to January 6, the Proud Boys espoused support for street violence against ideological enemies and violence against the police who might stand in their way.   And Scott was no mere participant in the Proud Boys.   He was an outspoken member of the group, giving voice to what others may have been only thinking.   As noted above, Scott was one of the first Proud Boys to openly call for the group to "take the fucking Capitol" early on January 6, 2021, long before the crowd had entered Capitol grounds.   Many Proud Boys later heeded his call.   Immediately on the heels of Scott's assault, two sprayed the same police line with OC.   Scott was also the Proud Boy who yelled "give 'em the rope!" at the Roger Stone rally three days before January 6, 2021, to drive home the seriousness of the view that legislators who voted to certify were committing treason.   And Scott

was the Proud Boy who, after January 6, made the Proud Boys challenge coin commemorating January 6 as a violent, glorious response to treason (hence the guillotine and noose).

Scott's coordination with the Proud Boys also amplified the threat of his violence on January 6.   After marching with over a hundred Proud Boys to and around the Capitol, Scott and other members of Zone 5 entered Capitol Grounds as a tight-knit group, reported their assaults to each other, and celebrated their collective breach of the police line.   Scott's choice to invade Capitol Grounds with other Proud Boys intent on obstruction and violence made his conduct all the more dangerous and his objective—obstructing the certification—all the more likely to succeed.   As the Supreme Court has recognized, "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality."   *Callanan v. United States*, 364 U.S. 587, 593 (1961); *see also United States v. Elmer Stewart Rhodes, et al.*, 22-cr-15, 05/25/2023 Sentencing Hearing Tr. 111:17–112:7 (quoting *Callanan*, 364 U.S. at 593).   These aspects of Scott's conduct set him apart from other assault cases and support a lengthy term of incarceration. Indeed, considered in isolation, Scott's assaults and their consequences would support a longer term of incarceration than is recommended here.

### B.  The History and Characteristics of the Defendant

Scott lives in Englewood, Florida, with his wife and two children.   He has no scoring criminal history.   As with any parent of young children, Scott's incarceration will cause hardships for his family.   It is regrettable that, notwithstanding his young family, Scott chose to travel to Washington for the events of January 6, enter a situation where he felt that he needed to wear a

ballistic vest for protection, attacked the police, aided in an historic breach of the Capitol, and then joked and minimized in the days and months that followed.

Nor was Scott a newcomer to political demonstrations.   He has attended numerous rallies, including peaceful rallies, in the past.   Scott thus surely recognized that when he was on Capitol Grounds on January 6, he was in a battle zone, not a lawful protest.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

Scott's assaults and obstruction of the certification of the vote resulted in a breach of the police line, and subsequently of the Capitol, that delayed the certification and almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power and throwing the United States into a Constitutional crisis.   Yet in his interviews with law enforcement, Scott consistently downplayed the seriousness of his offense or of the threat that day.   Plainly, a significant sentence is required to reflect the seriousness of Scott's offense and to promote the respect for the law—and law enforcement officers—that Scott's gleeful celebration of his assaults lacked.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.   *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

***Specific Deterrence***

The evidence also indicates that a significant sentence of incarceration is necessary to deter Scott specifically.   As noted above, Scott celebrated the consequences of his assaults and has repeatedly minimized his conduct in law enforcement interviews long after January 6, 2021.

First, in the days after the riot, Scott gloated about what he and his Proud Boy brothers had achieved.   Here he is celebrating with his co-defendant Worrell on the night of January 6, 2021:



*Image 11* (Worrell Tr. Ex. 107)

The day after the riot, he and Worrell joked about the "siege" of the Capitol.   Scott then made a challenge coin showing the U.S. Capitol in flames, with an image of a noose and executioner's guillotine, to glorify the riot.   *Supra* at 14-15.   As described above, even 18 months later, when Scott sat down for two law enforcement interviews, he continued to minimize his conduct and express little contrition.   To take three examples: he acknowledged his bulldozing of two officers was assault because even a fly landing on an officer would be guilty of that offense. Despite his outspoken role in a rally with Roger Stone—just three days before January 6—in which

Scott yelled that Florida's senators should be "give[n] . . . the rope" if they did not object to the certification, in his interview Scott claimed to be oblivious to what Congress was doing that day. He also claimed that on the morning of January 6, the Proud Boys essentially wandered away from the Washington Monument with no destination in mind, despite video evidence of the group's leaders providing marching orders to go to the Capitol.   Scott did plead guilty and acknowledge many facts about his criminal conduct that contradict some of these outlandish claims.   But he has still not expressed significant remorse.   These statements make clear that Scott had, at least as of November 2022, not yet come to grips with his conduct and the conduct of the group on that day.

**E.      The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). Accordingly, courts should give "respectful consideration to the Guidelines."   *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).   The government's recommendation is within the guidelines.

## F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   The goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is, however, "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008).

In addition, "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). Thus, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).[7]

This Court has imposed sentences in four prior cases involving both an assault conviction under 18 U.S.C. § 111 and an obstruction conviction under 18 U.S.C. § 1512.   (Two of the cases

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."

involved Section 1512(k) convictions for conspiring to obstruct the certification, but the penalties and guidelines for that offense are identical to those for a 1512(c)(2) conviction.)   Those four cases are the best comparators to Scott's case.   In each such case, this Court imposed a guidelines sentence due to the nature of the defendants' assaults and the gravity of the January 6, 2021 riot, even when the defendants pointed to strong mitigating facts in their favor.   The four cases are:

- *U.S. v. Scott Fairlamb*, 21-cr-120 (RCL).   Fairlamb's guidelines range was 41-51 months, and he received a sentence of 41 months' imprisonment.   Unlike Scott, Fairlamb pled guilty quite early after January 6, 2021, and expressed remorse early in the investigation.

- *U.S. v. Duke Wilson*, 21-cr-345 (RCL).   Wilson's guidelines range was 41-51 months.   Wilson pled guilty early, was 68 years old, and had "been an upstanding citizen all [his] life." Mar. 18, 2022 Sent. Tr., ECF No. 38, at 35.   He received a sentence of 51 months, at the top of the guidelines range, for his violence in the Lower West Terrace's tunnel.

- *U.S. v. Marshall Neefe and Charles Smith*, 21-cr-567 (RCL).   Neefe and Smith participated, with a large group, in thrusting a large metal sign into the police line. Both of these defendants' guidelines ranges were 41 to 51 months.   At the hearing, the Court noted their youth and family support, but sentenced both to 41 months due to their assaultive conduct and preplanning.   Sept. 23, 2022 Sent. Tr. at 49-50.

In Scott's case, the guidelines range is higher than in those four cases—51 to 63 months rather than 41 to 51 months.   He deserves a longer sentence given just how pivotal his assault was and because he acted in concert with the Proud Boys (the latter fact contributes to the extensive

scope/planning adjustment that gives Scott a higher guidelines range).   And there is nothing exceptional about Scott's case that would warrant a downward variance or departure given how similarly situated defendants have received guidelines sentences.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA") (codified at 18 U.S.C. § 3663) "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and apply to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).   Those principles have straightforward application here. The victim in this case, Officer Cetrone, did not suffer bodily injury as a result of Scott's assault. But the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Scott

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property . . . including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

must pay $2,000 in restitution that reflects in part the role Scott played in the riot on January 6.[9]

Dkt. 208 ¶ 11.[10]

## VIII.   CONCLUSION

██████████████████████████████ the government would be recommending

a sentence at or above the top of Scott's guidelines range; he committed one of the most

consequential assaults at the Capitol that day, he joined with his fellow Proud Boys to unleash a

mob to breach the Capitol, and he has not shown much if any remorse during several opportunities

to explain his conduct.   For the reasons set forth above, the government recommends that the

Court impose a sentence of 60 months' imprisonment, three years of supervised release, $2,000 in

restitution, and $200 in mandatory special assessments.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:   /s/ *William Dreher*
      WILLIAM DREHER
      Assistant United States Attorney (Detailed)
      D.C. Bar No. 1033828
      700 Stewart Street, Suite 5220
      Seattle, WA 98101
      (206) 553-4579
      william.dreher@usdoj.gov

ALEXIS J. LOEB

---

[9] The government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[10] The plea agreement notes that the January 6, 2021 riot had caused "approximately $1,495,326.55" in damages as of May 17, 2021.   *Id.*   That figure was updated to $2,881,360.20 in damages as of October 2022.   Scott will pay restitution to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 172.

Assistant United States Attorney (Detailed)
CA Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7168
alexis.loeb@usdoj.gov