UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

United States of America )
)
v. ) USDC No. 21-cr-292-02 (RCL)
)
)
Daniel Lyons Scott, *defendant*. )

DEFENDANT'S SENTENCING MEMORANDUM

Defendant, through undersigned counsel Nathan I. Silver, II, Esq., appointed by this Court under the Criminal Justice Act, submits this memorandum to aid at sentencing on July 12 , 2023, when he appears in person before the Court for his sentencing hearing.

1. The defendant entered a plea of guilty to Counts 1 and 15 of the second superseding indictment, which charge Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S. §§1512(c)(2) and 2 ("Obstruction") and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. §111(a)(1) ("Assault"), respectively. Obstruction carries a maximum penalty of up to twenty years, a fine of $250,000, or twice the pecuniary gain or loss of the offense, a term of supervised release of up to three years, and an obligation to pay interest or penalties on any fines or restitution not timely made. Assault carries a maximum penalty of up to eight years, and the same remaining terms as apply to Obstruction.

2. The parties agreed, with one exception, that the adjusted offense level would be no higher than 24 and no lower than 22. Both Obstruction and Assault have a Base Offense Level of 14. Added to Obstruction were 8 levels for causing or threatening to cause injury (USSG §2J1.2(b)(1)(B); and 3 levels for substantial interference with the administration of justice (USSG §2J1.2(b)(2). The government is seeking an additional 2 level enhancement for extensive

scope, planning or preparation (USSG §2J1.2(b)((3) and believes it applies, while under the Plea Agreement ("PA")  the defendant reserves the right to oppose its application. (PA, page 3) ( The presentence investigation report ("PSR") applies the enhancement, which produces a total offense level of 27, before credit for taking responsibility and doing so at an early time reduces the offense level to at most 24 and at least 22. (PA, pp. 3-4) [1][2]

3. The defendant has no juvenile adjudications; no adult convictions; what appears to be one driving violation (driving with no or a suspended license in 2017), and an arrest for "Minor Frequenting Off Limits Area," from 2012, at the age of 19, that was later dismissed.  (PSR, ¶¶92-98)  Thus, the defendant has no criminal history points and is placed in Criminal History Category I.

3. This case represents the defendant's first adult conviction.  It is regrettable that it is in the context of such a serious event as the riot at the U.S. Capitol on January 6.

4.  The government has presented a detailed, comprehensive account of the defendant's conduct both on January 6 and the days and weeks leading up to it.  It asserts that the conduct supports a finding that the appropriate guideline level is 24, that the 2 level enhancement for planning should apply, which produces a guideline The defendant opposes the enhancement.

5. Defendant cannot gainsay the many statements that he made in the days leading up to, and even on, January 6.  He wants the Court to understand the context in which they were made and what he expected when he came to Washington for the rally that day.  His experience with

---

[1] The PSR applied a 3 level enhancement for a victim related adjustment (government officer) under USSG ¶3A.1.2(a) but the parties believe it does not apply. (PSR, ¶84)

[2] As the offenses of Obstruction and Assault are grouped under USSG 3D1.2(c),  the level for the greater offense will produce the level that applies to both offenses. (*See* PA, page 3; PSR, ¶79)

the Proud Boys was mostly as a member of a social club where like-minded men would get together, drink, and pop off about their mostly congruent political views. He advised the U.S. Probation Office, in a request for information about the group, that he joined because of "The Brotherhood and fellowship"; he said it was "the complete opposite of organized when it even comes to food drives or family events." Its only requirement for membership was that "You have to love America, born a Male." He said he held no rank within the organization, and that the group "has never made me commit a crime in their name."[3] He said "Everyone has an equal voice. We're set up like a moose lodge or other fraternity or club," adding that he held no rank in the organization. (Email from defendant to USPO Hana Field,, April 11, 2023)[4] In the defendant's experience, there was a great deal of bluffing, bluster and bravado, but little or no follow through. The views people expressed were rarely, if ever, put into action.

6. The group did have one mission, though: to oppose agitators and troublemakers from Antifa and other far-left organizations. Frequently the Proud Boys would tangle with them. But in the defendant's experience, it was defensive in nature; the Proud Boys wouldn't go looking for a fight but they wouldn't shrink from one, either, especially when it seemed in the absence of law enforcement a vacuum allowed Antifa to run wild. The defendant is quite candid about his efforts to prevent Antifa and similar others from taking over the streets or trying to shut down protests or demonstrations by those it opposes.

---

[3] As the defendant has no record of arrests, much less convictions, while a member of the group, this statement must be true.

[4] USPO Field, who prepared the PSR, reported that she requested information from the defendant regarding his affiliation with the Proud Boys. The Draft PSR, filed on April 18, 2023, notes that as of the writing she had not received it. (PSR, ¶112) This is the result of counsel's oversight. The defendant sent his answers on April 11 to counsel but did not copy in Ms. Field. Counsel assured the defendant he would forward them to Ms. Field, (Counsel erroneously said, "I will forward it to you," meaning her, and then neglected to.) The email with Ms. Field's questions and the defendant's answers, which shows that the defendant sent them to counsel in a timely manner, is attached as Exhibit 1.

7. In fact, it was Antifa that the defendant expected to see in force on January 6. In anticipation, he prepared by wearing body armor and goggles in the event of a confrontation. But it was not to protect himself from lawful, even aggressive police action to control the crowd that day.

8. The talk or chatter between the defendant and others leading up to January 6 might seem "extensive in scope, planning, or preparation," but to the defendant it was more the blowing off of steam than part of an effort to actually stop the certification of the electoral votes, much less to reverse the results of the election and reinstall Trump as president.[5] The defendant describes a scene at the Capitol which at first was thronging with many protestors, yet acting peaceably in what was almost a festive atmosphere. He believes that the police acted prematurely using crowd control devices – such as tear gas and concussion grenades – and that the longer they were utilized, the darker and more restive the crowd became. The defendant estimates that these efforts — before there was any violence by protesters visible to him – lasted about forty-five minutes. Had he intended the whole time he was there to breach the police line, he wouldn't have endured those many minutes of tear gas and concussion grenades with their ghastly noise; he would have done it sooner–*much* sooner. It was then that the defendant moved into the police line, pulling one officer, pushing another. He attributes this to his almost 'snapping' from frustration with the continuous, aggressive crowd control effort. As to the issue of planning, the defendant highlights these facts recited by the PSR:

"On January 5, 2021, defendant Scott flew from Sarasota Bradenton International Airport to Baltimore-Washington International Airport on Delta Airlines. Defendant Scott flew with three

[5] Alfred Hitchcock made a career of showing how an ordinary, peaceable person can make threats one has no intention of carrying out: Ann: "You sound so savage, Guy." Guy: "Sure I sound savage. I *feel* savage. I'd like to break her neck! I said I'd like to break her foul, useless little neck!" (Train rumbles nearby) Guy: "What's that? I said I could strangle her!" And Guy becomes the chief suspect for the strangling another commits. (*Strangers on a Train*, 1951, Raymond Chandler and Czenzi Ormonde, adapted from the book by Patricia Highsmith)

other individuals who planned to attend events protesting the certification of the Electoral College vote on January 6, 2021. *Defendant Scott did not attend any meetings with Ethan Nordean, Joseph Biggs, or Zachary Rehl6 on January 5, 2021. Defendant Scott also was not a member of the Proud Boys' coordination chats on Telegram, "Ministry of Self-Defense" (or "MOSD") or "Boots on the Ground," and did not know the content of the messages in those chats.*" (PSR, ¶49 - emphasis added)

And:

"*Prior to his entry onto Capitol grounds, defendant Scott had not been told the details of any plans* made by Proud Boy leaders, such as defendants Nordean, Biggs, and Rehl, for January 6th." (PSR, ¶57 - emphasis added).

The PSR's factual recitation that follows, in ¶¶58-62, which takes the reader up to and through the assaultive conduct, a recitation the U.S. Probation Office obtained from the government, does not include any evidence that the defendant was following through on a plan to breach the Capitol.

Indeed, there is *no* evidence that the defendant received any kind of preliminary order – either in positioning himself in the crowd or a deadline for action – or a direction by phone or radio from any one in the group of Proud Boys that was assembled at the Capitol. This was a spontaneous act on the defendant's part, one that he recognizes as prohibited, criminal conduct – but it was not the result of planning.[6] It seems to the defendant that, for USSG 2J1.2(b)(3) to apply, the criminal act itself must be the product of planning or preparation, not simply occur after an activity that involved either element. In other words, the planning or preparation must

[6] Perhaps it should have been obvious to those in the crowd, including the defendant, that the police meant for the assembled protestors, observers and bystanders to leave the Capitol grounds. Yet those in the crowd were there because they felt cheated in the recent election. Sociologist Edward Banfield, writing in the 1970s and examining riots of the previous decade, says "The probability of rioting was increased by several factors that tended to give it legitimacy in the eyes of potential rioters. One was a feeling on the part of many people that they were not getting what they deserved…." ("Rioting Mainly for Fun and Profit," *The Unheavenly City,* Chicago: University of Chicago Press, 1974) Might the efforts to control the crowd have had an effect opposite from what was intended? . The crowd became more agitated, dug in, and prone to violence.. But that does not suggest, much less prove, that the defendant's assaults at the time he committed them were the product of extensive scope, planning or preparation.

produce or culminate in the criminal act. The defendant denies that's present here, and so asks the Court not to apply the two-level enhancement of USSG 2J1.2(b)(3)

9. The defendant has stipulated to the application of the eight-level enhancement for "causing or threatening to cause physical injury" to the officers he assaulted. (USSG §2J1.2(b)(1)(B) About this a few words should be said for the Court to take into account in determining what weight to give this aspect of the defendant's conduct, especially in considering and whether a sentence at the low end of the guidelines, or even further still, a variance, would be appropriate. The defendant did not make particularized threats against the officers, of the "I'm going to beat your brains in" variety; the government has advised the defendant in discovery that one officer remembers the defendant "calling all the officers cowards and punks…[and] saying something to the effect of we are coming in regardless if you like it or not, we are coming in *eventually*," which the officer would conclude meant the defendant would force his way through, possibly causing injury if the police resisted.[7] (emphasis added) And resistance could lead to physical injury, a not-unreasonable fear. In the context of an assault, that is more serious because it threatened injury.

The enhancement for it applies, because it was the apprehension of the officers, not the defendant's subjective feelings, that controlled. The defendant understands how one criminal act can produce consequences the actor did not consciously intend. Understanding this, the defendant accepted the enhancement. Still, the Court may consider the level of physical contact and the surrounding circumstances in determining the weight to give it.

[7] Without overstating its significance, the fact is that the defendant did not enter the Capitol, though many others, including Proud Boys, did. Nor did he cause physical injury to the officers or damage to property.

10. Under 18 U.S.C. §3553(a) the following factors: (a) Factors To Be Considered in Imposing a Sentence. - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider - (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner….

11. The nature, history and circumstances of the defendant all support a sentence at the low end of the guideline range, if not a variance below it.. The defendant, the Court knows, has no criminal record. He is married with two young children. Since he was charged in this case, as the family's sole financial support, he has taken as many jobs as he has been able to handle, sometimes juggling three different ones. He provides as much care as possible to his wife, who suffers from a disabling, debilitating illness. In at least the past fifteen months, she has been in and out of the hospital, undergoing more than one major surgery. The defendant makes arrangements with a friendly neighbor so his children will be safe and watched over while he is at work, day or night. He has worked continuously since he was nineteen years old. (PSR, ¶¶146-157) Unfortunately, his best, highest-paying job, at the Boeing Corporation, working on airframes, ended after nearly seven years in a dispute over his attending college classes during working hours. (PSR, ¶153) His experience at Artur's Restaurant in Englewood, Florida, where

he worked recently (from Nov. 2022 to March 2023) is representative: “It is noted the defendant was reliable, a good worker, and always happy to help. He is considered for reemployment.” (PSR, ¶148) Letters from friends and an employer attest to his good nature, reliability, and decency. (Exhibit 2)

Which leads into another aspect of his life: the defendant has a keen intelligence. In effect, he completed high school at the age of fifteen and a half. His high school arranged for students in its accelerated program to take three college classes per semester, while taking one high school class – more a formality – to maintain enrollment and obtain a high school degree. (PSR, ¶139) He has many talents: singing, playing guitar, considerable mechanical skills, hosting a podcast called “Milkshake Happy Hour.”[8] It’s not the place of counsel to vouch for clients, but the defendant has a command of language and a droll sense of humor unlike anything counsel has seen in his experience in the practice of law, and has rarely seen outside it.

Many, or possibly most, of the defendants who appear before the Court in criminal cases are criminals, repeat offenders. The challenge here is that the defendant is not a criminal – crime is not his way of life – yet he committed serious criminal acts. And the defendant, feeling frustration with this experience, expressed to counsel this thought:

> “*The judge doesn’t even know me. (The) community I love is cherishing me and appreciating me for who I am. Even after the fact of January 6th….I’m not a violent person. I’m just a simple person with ideas…I’m not perfect, but damn…*”

11. The government has stressed that it appears that the defendant has failed to show remorse, sufficient if at all, for his actions. The Court must know that some persons are more expressive than others, or have an easier time of revealing themselves, especially in public

[8] The defendant, understanding that incarceration awaits him, has told counsel that he hopes to study music, both instrumental and composition, while he serves his sentence, so he can make that his career upon release.

settings. It's also true that defendants who are new to the criminal justice system often don't understand what makes certain acts criminal or why the consequences of those acts might be so. That certainly applies in the January 6 cases. Many people who entered the Capitol believed they were clothed in the protective garb of the 1st Amendment. They had a naive or uninformed belief that if one were demonstrating, the 1st Amendment would guard them anywhere in this country. And some people take longer to come to terms with the nature of their own conduct when they've not led *lives* of crime. Maybe that operates here.

But it's less important that the defendant seems not to be remorseful than that he takes responsibility for his actions. He has pleaded guilty, not insisting on a trial and requiring the government and the Court to expend its resources on such a venture. Many January 6 defendants, whether or not affiliated with groups such as the Proud Boys or Oath Keepers, have chosen to have trials. The defendant has not done so.

12. The defendant understands that a sentence of incarceration will reflect the seriousness of the offense, promote respect for the law, and provide just punishment, while it affords adequate deterrence to criminal conduct. He submits that a sentence at the low end of a range of 41-51 months, which would not include the enhancement for planning, would be suitable and sufficient. He asks that the Court view his conduct as an anomaly in his own law-abiding life, just as January 6 was an anomaly in this country's history and tradition of peacefully transferring power, as our Constitution was meant to ensure.

This pleading is,

Respectfully submitted,

/s/

NATHAN I. SILVER, II

Unified Bar #944314
6300 Orchid Drive
Bethesda, MD 20817
(301) 229-0189 (direct)
(301) 229-3625 (fax)
email: nisquire@aol.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served via ECF on William Kennelly Dreher, Esq., Alexis Jane Loeb, Esq., and Joseph Hutton Marshall, Esq., USAO for the Western District of Washington, the Northern District of California, and the District of Columbia, respectively, this 9th day of July, 2023.

/s/

___________________________________

*Nathan I. Silver, II*